Merrimack, }
Feb. 6, 1906. }

### BOSTON OUTFITTING CO. v. PEOPLE & PATRIOT CO.

In an action against a publisher for breach of an advertising contract, the defendant's rate-card is not admissible to prove the market value of the required service if the conditions to which its schedules apply differ materially from those specified in the agreement in suit.

ASSUMPSIT, for the breach of a written contract. Trial by jury and verdict for the plaintiffs for $484.80. Transferred from the October term, 1904, of the superior court by *Wallace*, C. J. The contract was for the insertion " in the advertising columns of the 'Daily Patriot' [of] 1,248 inches display advertising, to be used in one year," for which the plaintiffs were to pay $52 in monthly instalments " as used," and provided that if the plaintiffs failed to use that quantity of space they would pay for the quantity used " at short time rates."

The evidence tended to prove the following facts: After the defendants had inserted in the " Daily Patriot " four advertisements furnished by the plaintiffs,—one of twelve inches twice, one of four inches once, one of eight inches four times, and one of four inches seven times,—they refused to insert other similar advertisements offered by the plaintiffs, on the ground that the contract called for the daily insertion of advertisements uniformly occupying a space of four inches. The rate-card described in the opinion was put in evidence, as showing the market prices for advertising spaces in Concord papers. It contained no rate for a large advertising space—say 1,000 inches—to be used intermittently and in varying quantities, according to the will of the advertiser. The publishers of the local papers make special contracts with foreign advertisers for such advertising, at the rate of seven and a half cents an inch. Concord advertisers do not use this plan, and the rate for it was unknown to the plaintiffs. After the insertion of the four advertisements, the defendants presented to the plaintiffs a bill for the same at the rates given in the rate-card,—the quantity amounting to eighty-eight inches and the prices to $32.83,— but the bill was settled on the basis of the contract price.

The defendants excepted to an instruction to the jury that the card rates were evidence upon the market value of the plaintiffs' contract, and to the denial of their request to instruct the jury to the contrary.

*Martin & Howe*, for the plaintiffs.

*Sargent, Remick & Niles, Henry F. Hollis*, and *Michael Meehan*, for the defendants.

CHASE, J.   The question before the court does not arise upon payments actually made by the plaintiffs at the card rates, for advertising procured by them to take the place of that of which they were deprived by the defendants' breach of the contract; if it did, it would present a very different aspect.  *Tribune Co.* v. *Bradshaw*, 20 Ill. App. 17.   The exception raises the simple question, whether the rate-card was competent evidence of the "market value of the plaintiffs' contract."   By "market value" was probably meant the "net value," or "the difference between the stipulated price and the cost of doing the work."  *Hutt* v. *Hickey*, 67 N. H. 411, 417.   The question whether this was the correct rule of damages is not before the court, and has not been considered.

The advertising called for by the contract was 1,248 inches, "to be used in one year."   In other words, the plaintiffs were entitled to have advertisements occupying that space inserted in the "Daily Patriot" in the year, in such portions and with such intervening intervals of time as they saw fit.   The rate-card contains no rate for advertising in that way.   It has a table giving the prices for advertising spaces varying from one to twenty-one inches, used one, two, three, four, five times, and daily one to three weeks and one to twelve months.   This table is arranged in twenty-one columns and twenty-one lines, the left-hand column, headed "inches," containing the figures 1 to 21 inclusive, and the successive columns from left to right, headed "1 time," "2 times," etc., "1 week," etc., "1 month," etc., containing the prices for advertisements occupying the spaces given in the same lines respectively in the left-hand column inserted the number of times indicated in the headings of the columns.   The entire table gives specific prices for 420 separate combinations of spaces and number of insertions.   These prices decrease as the space and number of insertions increase, but not in a uniform ratio.   For example, the rate for an advertisement occupying one inch inserted once is seventy-five cents ; inserted twice, $1.10 ; daily for one month, or twenty-six times, $4 ; for twelve months, or 312 times, $18 : the rate for a four-inch advertisement inserted once is $2.25 ; twice, $3.50 ; daily for six months,

or 156 times, $44: for twelve months, $68: the rate for an eight-inch advertisement inserted once is $4.25; daily for six months, $88; for one year, $136: the rate for a sixteen-inch advertisement inserted once is $8.25; daily for three months, $111; and for a year, $273. These rates relate to advertisements inserted in regular daily succession. Two thirds of these rates are charged when the insertions are made every other day instead of daily.

A very large number of combinations of spaces and number of insertions can be made from the table which will give a total of 1,248 inches, but the amounts of the prices pertaining to the several combinations will differ widely from each other. For example, a four-inch advertisement inserted daily for a year (312 times), an eight-inch advertisement inserted 156 times, or a sixteen-inch advertisement inserted seventy-eight times, will occupy 1,248 inches in all; but the prices of such advertisements are $68 (nearly five and a half cents an inch), $88 (about seven cents an inch), and $111 (nearly nine cents an inch), respectively. The same discrepancy is shown by taking a space specifically given in the table—twenty inches for instance; the price of one insertion of such an advertisement is $10.25 (fifty-one and a quarter cents an inch), while the price of the insertion of a four-inch advertisement five times (twenty inches in all) is $7 (thirty-five cents an inch), or a five-inch advertisement four times $7.25 (thirty-six and a quarter cents an inch), or a ten-inch advertisement twice $8.50 (forty-two and a half cents an inch). According to the table, the eighty-eight inches of advertising which the plaintiffs used came to $32.83, an average of thirty-seven and a quarter cents an inch. The plaintiffs suggest the theory that the jury arrived at their verdict by adopting the average rate per inch of this advertising as the unit of market value, and it is quite probable that they did so. If it had happened that the eighty-eight inches had been made up of twelve inches inserted twice, eight inches inserted twice, and four inches inserted two weeks, the bill, according to the rate-card, would have been $23 instead of $32.83, and the average rate would have been a little over twenty-six cents an inch instead of thirty-seven and a quarter cents; or if the total quantity had been made of spaces containing four, eight, ten, twelve, sixteen, eighteen, and twenty inches respectively, each inserted once, the bill would have been $45.75, or fifty-two cents an inch.

The impotency, or, rather, the positive misleading character of such a table, as evidence upon the market value of the advertising called for by the contract, is obvious. The conditions to which the table and the contract respectively apply differ so materially that the value of the advertising mentioned in one has no tendency to show the value of the advertising mentioned in the other. If

there were a market value—say seven and a half cents an inch—
for the advertising required by the contract, the fact would not be
evidence of the market value of an advertisement occupying one
inch of space inserted once, or any other advertising specified in
the table. No more are the prices given in the table evidence of
the value of the advertising called for by the contract. The sole
tendency of the table was to excite speculation and conjecture for
obtaining premises upon which to exercise the judgment in estimat-
ing the value of the contract. It had no tendency to prove facts
which would lead the judgment to a true and just conclusion. Its
submission to the jury was error which was liable to be prejudicial
to the defendants.

*Exceptions sustained : verdict set aside.*

All concurred.